IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH,
and SIERRA CLUB,

        Plaintiffs,

v.                                           CIVIL ACTION NO.  5:12-cv-1464

MARFORK COAL COMPANY, INC., and
INDEPENDENCE COAL COMPANY, INC.,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES AGAINST DEFENDANT INDEPENDENCE COAL CO., INC.**

DEREK O. TEANEY (WVSB # 10223)
JOSEPH M. LOVETT (WVSB # 6926)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax: (304) 645-9008
E-mail: dteaney@appalmad.org

**INTRODUCTION**

This citizen suit under the Federal Water Pollution Control Act (hereinafter, the "CWA" or the "Clean Water Act") and the Surface Mining Control and Reclamation Act ("SMCRA") raises three claims for relief against Defendant Independence Coal Company, Inc. ("Independence"), based on Independence's violations of the effluent limitations in its West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") Permit WV1029711 and on its failure to install adequate selenium treatment facilities.  Plaintiffs are entitled to Summary Judgment on the question of liability raised by their Fourth, Fifth, and Sixth Claims for Relief, as well as to declaratory and injunctive relief and to the imposition of civil penalties.

**LEGAL FRAMEWORK**

The CWA prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit.  Id. § 1311(a).  One such permit is a National Pollution Discharge Elimination System ("NPDES") Permit issued by the United States Environmental Protection Agency ("EPA") or an authorized state.  Id. § 1342.

NPDES permits allow the discharge of pollutants on the condition that such discharges will comply with all CWA requirements.  Id. § 1342(a).  "The issuance of a NPDES permit does not authorize the recipient to pollute at will."  Sierra Club v. Powellton Coal Co., LLC, 662 F. Supp. 2d 514, 516 (S.D. W. Va. 2009).  Among the limitations prescribed in NPDES permits are effluent limitations.  Id. § 1362(11).   EPA has authorized West Virginia, through the West Virginia Department of Environmental Protection ("WVDEP"), to administer the NPDES program for this state.  Permits issued under that program are known as "WV/NPDES" permits.

CWA Section 505(a) authorizes citizen suits "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter . . . ."  Id. § 1365(a).  For

1

citizen suit purposes, effluent standards or limitations include conditions of NPDES permits. Id. § 1365(f).

This action also arises under SMCRA, the comprehensive federal statute governing surface coal mining. Section 506 of SMCRA prohibits surface coal mining operations without a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or from an approved state regulatory authority. 30 U.S.C. § 1256. West Virginia administers such an approved surface mining regulatory program through the WVDEP. See 30 C.F.R. § 948.10.

Among the performance standards mandated by SMCRA and the West Virginia Surface Coal Mining and Reclamation Act is the requirement that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." 30 C.F.R. §§ 816.42 and 817.42; 38 C.S.R. § 2-14.5.b. Another SMCRA performance standard requires that, "[i]f drainage control, restabilization and revegetation of disturbed areas, diversion of runoff, mulching, or other reclamation and remedial practices are not adequate to meet the requirements of this section and § 816.42, the operator shall use and maintain the necessary water-treatment facilities or water quality controls." 30 C.F.R. § 816.41(d)(1); see also 38 C.S.R. §2-14.5.c ("Adequate facilities shall be installed, operated and maintained using the best technology currently available in accordance with the approved preplan to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection."). Furthermore, West Virginia regulations provide that the performance standards are conditions of all surface mining permits. 38 C.S.R. § 2-3.33.c.

Like the CWA, SMCRA includes a citizen suit provision. It authorizes federal courts to compel compliance with SMCRA against operators "alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]." 30 U.S.C. § 1270(a)(1); Ohio Valley

Envtl. Coal., Inc. v. Apogee Coal Co., LLC, 531 F. Supp. 2d 747, 760–64 (S.D. W. Va. 2008).

**FACTUAL AND PROCEDURAL BACKGROUND**

Independence's unlawful discharges result from surface mining activities at its Crescent No. 2 Surface Mine in Boone County, West Virginia.  That mine is regulated by Surface Mining Permit S502007.  WVDEP issued WV/NPDES Permit WV1029711 to Independence to regulate the water pollution discharges from the Crescent No. 2 Surface Mine.  Ex. 1 to Ps' Partial S.J. Mot.[1]  That permit limits the concentrations of pollutants in Independence's discharges into Petry Fork of Matts Creek of the West Fork of Pond Fork of the Little Coal River from Outfall 001.  Id.

The limits prescribed in WV/NPDES Permit WV1029711 restrict the selenium concentration at Outfall 001 to a monthly average concentration of 4.7 µg/l (micrograms per liter) and a daily maximum concentration of 8.2 µg/l.  As established by the discharge monitoring reports ("DMRs") that Independence submitted to WVDEP, Independence accrued at least 450 days of violations of the selenium limits in WV/NPDES Permit WV1029711 between March 2010 and July 2012.  Ex. 2.  See also Ex. 3 (spreadsheet of violations broken down by outfall and month); Ex. 4.[2]

**STANDARD OF REVIEW**

A party is entitled to summary judgment when it establishes that there is no genuine issue

---

[1] Unless otherwise noted, all exhibits are exhibits to the Plaintiffs' Motion for Partial Summary Judgment against Independence filed in conjunction with this memorandum.

[2] Exhibit 4 authenticates the DMRs referenced in this motion and memorandum (Exhibit 2), as well as Independence's WV/NPDES Permit WV1029711 (Exhibit 1), the spreadsheets created to highlight the data found in the DMRs (Exhibit 3), Plaintiffs' 60-day notice letter (Exhibit 10), Defendants' Responses to Plaintiffs' First Request for Admissions (Exhibit 11), Defendants' Responses to Plaintiffs' Second Request for Admissions (Exhibit 12), and Defendants' Answers to Plaintiffs' First Request for Answers to Interrogatories (Exhibit 13).

as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## ARGUMENT

Plaintiffs are entitled to summary judgment because, as a matter of law, (1) Plaintiffs have standing, (2) Plaintiffs provided the requisite notice of intent to sue, (3) Plaintiffs can establish that Independence is in continuing violation of the CWA and SMCRA, and (4) the indisputable evidence reveals violations of the relevant statutes, regulations, and permits.

**I.       Plaintiffs Have Standing to Prosecute this Action**

Article III of the United States Constitution limits the jurisdiction of federal courts to the resolution of cases and controversies. To establish Article III standing, a plaintiff must establish (1) injury-in-fact, (2) traceability, and (3) redressability. <u>Amer. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 517 (4th Cir. 2003). An organization has representational standing when (1) at least one of its members would have standing to sue in his or her own right, (2) the organization's purpose is germane to the interests that it seeks to protect, and (3) there is no need for the direct participation of the individual members in the action. <u>Id.</u>

To establish injury-in-fact in the environmental context, "a plaintiff need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area [are] lessened" by the defendant's activity. <u>Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD</u>, 268 F.3d 255, 263 (4th Cir. 2002) (internal quotation marks omitted; modification in original). Federal courts have noted that "Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permittee's effluents flow." <u>Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC</u>, 702 F. Supp. 2d 644, 650 (S.D. W. Va. 2010) (quoting <u>Student Public Interest Research Group of New Jersey, Inc. v. Georgia-Pacific Corp.</u>, 615 F. Supp. 1419,

4

1424 (D.N.J. 1985)).  A CWA citizen-plaintiff can establish injury-in-fact by submitting evidence that the defendant has discharged a pollutant in excess of its effluent limitations into a stream used by the plaintiff.  Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp., 204 F.3d 149, 157 (4th Cir. 2000).

Such evidence is also sufficient to satisfy the traceability prong.  The Fourth Circuit has explained that "a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Id. at 161 (internal quotation marks omitted); see also Hobet Mining, 702 F. Supp. 2d at 650–51.

Finally, injunctive relief and civil penalties can redress the injuries caused by violations of effluent limitations.  Injunctive relief can prevent future violations and civil penalties can deter the defendant and other polluters from future violations.  Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. (Laidlaw), 528 U.S. 167, 174 (2000); Gaston Copper Recycling, 204 F.3d at 162–63.  The court's remedy need only redress a plaintiff's injuries to some degree; it need not eliminate them. Massachusetts v. E.P.A., 549 U.S. 497, 525–26 (2007).  Hobet Mining, 702 F. Supp. 2d at 653.

Plaintiffs have standing to pursue their claims against Independence through at least three of their members: Maria Gunnoe, Vivian Stockman, and Chuck Nelson.  Those members have standing because they are users of Petry Fork, Matts Creek, and West Fork of Pond Fork. Indeed, this Court has previously concluded that those three individuals had standing to prosecute Independence's violations of selenium limits on discharges that affected West Fork of Pond Fork of the Little Coal River.  Ohio Valley Envtl. Coalition v. Independence Coal Co., Inc., 775 F. Supp. 2d 900, 913–14 (S.D. W. Va. 2011). Declarations from Ms. Gunnoe, Ms. Stockman, and Mr. Nelson are attached to Plaintiffs' Motion for Partial Summary Judgment as Exhibits 5, 6, and

5

7, respectively, and transcripts of the depositions of Ms. Gunnoe and Ms. Stockman are attached as Exhibit 8 and 9, respectively.[3]

Boone County native Maria Gunnoe is a member of all four plaintiff organizations. Ex. 8 at 23–24. She has used Petry Fork of Matts Creek "throughout [her] lifetime." Id. at 26. In her declaration, Ms. Gunnoe described the annual fish fries that she would attend as a child and as a teenager along Matts Creek. Ex. 5 at ¶ 16. The selenium contamination for which Independence is responsible in Matts Creek makes her "feel like something has been taken away from [her] and [her] family and friends." Id. When asked in her deposition about why she is involved in this lawsuit, Ms. Gunnoe responded:

> I grew up in this area. Independence Surface Mine is just across the ridge from my home. Independence also encompasses a mountain which was known as Montcoal Mountain. I spent most of my childhood growing up on that mountain. We have family members that lived there. We still have cemeteries --- Bailey, Asbury, and General Cemeteries are all on Montcoal Mountain. Throughout my childhood, you accessed these mountains through Matts Creek. And that was my stomping grounds, if you will, growing up. I had a lot of family and friends that lived in those hills and valleys.

Ex. 9 at at 20–21. Ms. Gunnoe also testified in her deposition that, throughout her lifetime, she "used [Petry Fork] as anyone would use a stream. We swam in it. We gathered bait in it." Id. at 26. Ms. Gunnoe last visited Petry Fork about eight months ago while visiting a cemetery. Id. at 27. When asked how Independence's selenium discharges affected her enjoyment of that stream on that visit, Ms. Gunnoe testified:

> Well, there's no --- there's nearly no life left in the stream. As a child, I used to enjoy going and feeding the ducks and catching minnows and things like that. And you can't do that anymore. What ducks are there --- there's a few ducks actually that I've seen that's deformed. There's one duck that had a clubbed foot. And that worried me. I was very concerned that that was caused by the Selenium.

---

[3] Defendants did not depose Mr. Nelson.

6

Id. at 28–29.  In short, Ms. Gunnoe's enjoyment of Petry Fork, Matts Creek, and West Fork of Pond Fork is diminished greatly by selenium pollution from the Crescent No. 2 Mine.  Id.

Vivian Stockman is a long-time member of both the Ohio Valley Environmental Coalition and the West Virginia Highlands Conservancy, and she also belongs to Coal River Mountain Watch.  Ex. 6 at 1.  Several times a year in recent years, Ms. Stockman has frequently travelled along the West Fork of Pond Fork, which is downstream of Outfall 001's discharges into Petry Fork of Matts Creek.  Id. at 2.  Ms. Stockman explains that she often walks along the stream when she is in the area, that the selenium pollution diminishes her enjoyment, and that she intends to return to this area in the future.  Id. at 3.  Ms. Stockman further explains in her declaration that, on her three visits to Matts Creek in 2012, she "look[ed] around the area and observe[d] changes.  My enjoyment of my time along Matts Creek and the West Fork of Pond Fork was diminished by my concerns about accumulating effects of selenium from mines along Matts Creek on fish and wildlife.  That this pollution continues to occur infuriated and aggravated me."  Id. at ¶ 16.  Ms. Stockman last visited Matts Creek in September 2012.  Ex. 9 at 19.  When asked at her deposition about how her enjoyment of Matts Creek was affected by Independence's selenium discharges, Ms. Stockman responded:

> Well, I know that Selenium is a bioaccumulative toxin and that you can't see it
> and that it's there.  One thing that really bothers me and upsets me is thinking
> about birds that can't --- don't have any alternative but to eat the fish. . . .
> Thinking about the cumulating effects of the toxin is upsetting.  Thinking about,
> you know, the web of life disrupted is upsetting.  I mean, this is just ---.  There's
> no reason for the company to be discharging beyond its amount and disrupting the
> environment.  And basically aquatic life is ---.  You know, birds have to eat that.

Id. at 25–26.

Chuck Nelson, a disabled coal miner and resident of Glen Daniels, West Virginia, is a member of both the Ohio Valley Environmental Coalition and Coal River Mountain Watch.  Ex.

7

7 at 1. Mr. Nelson has a deep appreciation for the importance of water quality, and he has watched as the water quality has deteriorated near his home to the point that children no longer play in the water as he once did. Id. at 2. He is well-versed in the dangers of selenium pollution. Id. Mr. Nelson also has deep experience in and around the streams affected by discharges from Outfall 001 of WV/NPDES Permit WV1029711. Id. at 2–3. He worked at a mine at nearby Matts Creek and has been there hundreds of times. Id. Mr. Nelson used to fish at the confluence of Matts Creek and West Fork of Pond Fork, but he no longer does so because he knows the water is polluted with selenium. Id. at 3. His enjoyment of this area is diminished by water quality concerns, including selenium pollution. Id. He plans to return to the area in the future. Id.

As established by their declarations and deposition testimony, Plaintiffs' members experience injuries-in-fact to their recreational and aesthetic interests in Petry Fork, Matts Creek, and West Fork of Pond Fork. Ms. Gunnoe, Ms. Stockman, and Mr. Nelson all describe a personal connection to the affected streams, and lament that their enjoyment of their time along those streams is diminished by concerns about the effect on aquatic life of selenium discharges from Independence's upstream mining operations. Those individuals express reasonable concerns about selenium's effects on fish, aquatic life, and waterfowl, and the resulting harm to their lives. In other words, the declarants are individuals "for whom the aesthetic and recreational values of the area will be lessened" by Independence's repeated effluent limitation violations. See Piney Run Preservation, Ass'n, 268 F.3d at 263.

Moreover, Plaintiffs' members' injuries are fairly traceable to Independence's selenium discharges. As this Court has repeatedly noted, "the relevant showing for standing is not injury to the environment, but injury to Plaintiffs." Hobet Mining, 702 F. Supp. 2d at 650 (quoting

8

Ohio Valley Envtl. Coalition v. Apogee Coal Co., LLC, 3:07-cv-413, Doc. # 67 at 7). Here, Plaintiffs' members curtail their use, reluctantly cease certain uses such as fishing, and enjoy the area less because of their reasonable fears regarding selenium from Independence's upstream facilities. See id. at 650–51. Selenium has been designated a toxic pollutant by the EPA, 40 C.F.R. § 401.15. Moreover, as US EPA observed in its veto of the Spruce No. 1 CWA permit:

> Selenium toxicity is primarily manifested as reproductive impairment and birth defects due to maternal transfer, resulting in embryotoxicity and teratogenicity in egg laying vertebrates (e.g., fish and ducks). The most sensitive toxicity endpoints in fish larvae are teratogenic deformities such as skeletal, craniofacial, and fin deformities, and various forms of edema. Embryo mortality and severe developmental abnormalities can result in impaired recruitment of individuals into populations.

US EPA, Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia 51 (2011). Despite those potential harms, Independence is discharging selenium into Petry Fork of Matts Creek of West Fork of Pond Creek in violation of its water quality based effluent limitations. Consequently, Plaintiffs' members' concerns are reasonable, and Plaintiffs can satisfy the traceability requirement.

Finally, Plaintiffs' members' injuries can be redressed by injunctive relief and civil penalties. Laidlaw, 528 U.S. at 174; Gaston Copper, 204 F.3d at 162–63; Hobet Mining, 702 F. Supp. 2d at 651–52. Because their members have standing to bring the claims against Independence, the requirements for organizational standing are satisfied. Amer. Canoe Ass'n, 326 F.3d at 517.

**II.     Plaintiffs Complied with the 60-Day Notice Provisions**

Before citizens may file a citizen suit under the CWA or SMCRA, they must provide prospective defendants with 60 days notice of their intent to sue. 33 U.S.C. § 1365(b)(1)(A); 30

9

U.S.C. § 1270(b)(1)(A). Plaintiffs have satisfied the notice requirements of both statutes in this case. Exhibit 10 is the 60-day notice letter on which Plaintiffs rely. Pursuant to FRCP 36, Independence has admitted that Plaintiffs' March 9, 2012 notice letter "satisfied the 60-day notice requirements of 33 U.S.C. § 1365(b)(1)(A) and 30 U.S.C. § 1270(b)(1)(A) with regard to the violations" alleged in Plaintiffs' complaint, thereby conclusively establishing that the notice requirements of the CWA and SMCRA have been met. Ex. 11.

### III. Independence is in Continuing Violation of the CWA and SMCRA

The CWA citizen suit provision provides that any person may commence a civil suit in federal court against any other person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ." 33 U.S.C. § 1365(a). SMCRA's citizen suit provision similarly permits civil actions against persons "alleged to be in violation of any rule regulation, order or permit issued pursuant to [SMCRA]." 30 U.S.C. § 1270(a)(1).

In Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation ("Gwaltney"), 484 U.S. 49 (1987), the Supreme Court interpreted the phrase "alleged to be in violation" in CWA Section 505 and held that it authorizes federal district courts to entertain citizen suits when plaintiffs "make a good-faith allegation of continuous or intermittent violation." Id. at 64. Because of the similarity in language, the same interpretation applies to SMCRA's citizen suit provision. Cf. Coalition for Health Concern v. LWD, Inc., 60 F.3d 1188, 1193 (6th Cir. 1995) (applying Gwaltney to citizen suit under CERCLA because of similarity in language between CERCLA and CWA).

Independence's recent violations, coupled with the lack of any meaningful remedial action, establish continuing violations of its selenium limits. There are two ways in which a

plaintiff can prove a continuing violation. The Fourth Circuit explained that:

> [c]itizen-plaintiffs may accomplish this either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd. ("Gwaltney II"), 844 F.2d 170, 171–72 (4th Cir. 1988). That test is commonly referred to as the Gwaltney II test and can be met by satisfying either prong. See e.g., Amer. Canoe Ass'n v. Murphy Farms, 412 F.3d 536, 539 (4th Cir. 2005); Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC, 723 F. Supp. 2d 886, 923 (S.D. W. Va. 2010).

The DMRs that Independence submitted to WVDEP pursuant to WV/NPDES Pemrit WV1029711 establish that Independence violated the selenium limits on Outfall 001 of that permit as recently as July 2012. Exs. 2 & 3. The DMRs constitute binding admissions of the violations alleged in Plaintiffs' Complaint. See, e.g., Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1115 n.8 (4th Cir. 1988). Moreover, Independence has admitted, pursuant to FRCP 36, that it "has discharged effluent from Outfall 001 of WV/NPDES Permit WV1029711 with selenium concentrations that exceed the selenium effluent limitations on that outfall on at least one occasion since May 9, 2012[,]" thereby conclusively establishing post-complaint violations. Ex. 12. Therefore, this Court has jurisdiction over this action under the first prong of the Gwaltney II test.

**IV.   Independence is Liable for Hundreds of Violations of the CWA and SMCRA**

The violations of the selenium limitations in WV/NPDES Permits WV1029711 form the basis for Plaintiffs' CWA and SMCRA claims. To determine liability for permit violations, "all the court . . . is called upon to do is compare the allowable quantities listed in the permits with the available statistics on actual pollution." Student Pub. Interest Res. Gp. of N.J. v. Monsanto,

11

600 F. Supp. 1479, 1483 (D.N.J. 1985), cited in Hobet Mining, 723 F. Supp. 2d at 896. Dischargers are strictly liable for their permit violations. E.g., Stoddard v. Western Carolina Regional Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986); Hobet Mining, 723 F. Supp. 2d at 923; W. Va. Highlands Conservancy v. Huffman, 651 F. Supp. 2d 512, 519 (S.D. W. Va. 2009). Consequently, a violation of the requirements of a NPDES permit is automatically a violation of the Act. See Laidlaw, 528 U.S. at 174; Hobet Mining, 723 F. Supp. 2d at 923.

Independence's WV/NPDES Permit WV1029711 is attached to Plaintiffs' Motion for Partial Summary Judgment as Exhibit 1. That document is the source of the information in the "Units" and "Limits" columns in the spreadsheets at Exhibit 3.

In response to public records requests under the Freedom of Information Act, WVDEP provided to Plaintiffs database reports of Independence's DMRs for December 1, 2008 through July 31, 2012. See Ex. 2. DMRs constitute binding admissions and may be used to establish liability. Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1115 n. 8 (4th Cir. 1988). Independence's DMRs reveal that it has violated either the monthly average or daily maximum selenium effluent limits in WV/NPDES Permit WV1029711 on at least 37 instances since March 5, 2010. See Exs. 2 & 3. A violation of an average monthly effluent limitation constitutes a violation of the limit on every day of that month. See, e.g., Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 791 F.2d 304, 313–15 (4th Cir. 1986), vac'd on other grounds, 484 U.S. 49 (1987). Based on that principle, Independence's DMRs reveal that it has accrued 450 days of violations of the CWA since March 5, 2010, by violating the selenium limitations at Outfall 001 of WV/NPDES WV1029711. Exs. 2 & 3. The conclusive evidence of hundreds of violations of Independence's WV/NPDES permit entitles Plaintiffs to summary judgment on liability for their Fourth Claim for Relief and a declaratory judgment that Independence has

violated the CWA.

In addition to the Clean Water Act claims, Plaintiffs are entitled to summary judgment on liability related to the SMCRA claims in their Fifth and Sixth Claims for Relief. The performance standards under SMCRA mandate that discharges from mining operations "be made in compliance with all applicable State and Federal water quality laws and regulations and with the effluent limitations for coal mining promulgated by the U.S. Environmental Protection Agency set forth in 40 C.F.R. Part 434." 40 C.F.R. §§ 816.42 & 817.42. The regulations under the West Virginia Surface Coal Mining and Reclamation Act (the "State Act") prescribe a similar standard. 38 C.S.R. § 2-14.5.b ("Discharge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards."). The DMRs that Independence submitted to WVDEP conclusively establish 450 days of violations of the performance standard that prohibits violations of effluent limitations.

Moreover, as discussed above, federal and state performance standards require the installation, operation, and maintenance of adequate treatment facilities when necessary to prevent discharges that violate state or federal law. 38 C.S.R. §2-14.5.c. Independence's continuing violations of its selenium effluent limitations are prima fascia evidence that Independence has failed to install and operate adequate selenium treatment facilities on Outfall 001 of WV/NPDES Permit WV1029711. Moreover, in discovery Plaintiffs presented an interrogatory to Independence, asking it to "[p]lease explain or describe any selenium remedial measures that you have considered related to discharges regulated by WV/NPDES Permit[] . . . WV1029711." Ex. 13. In response, Independence asserted that, as of October 10, 2012, "[a] moving bed biologic reactor has been fully designed and is being constructed at WV1029711, outfall 001." Id. Because a treatment system is only under construction, Independence remains

13

in violation of the performance standard requiring the operation of an adequate treatment facility to prevent violations of its selenium effluent limitations.

Independence's violations of SMCRA performance standards place it in violation of the terms and conditions of its Surface Mining Permit for the Crescent No. 2 Surface Mine. By operation of 38 C.S.R. § 2-33.c, that permit incorporates the performance standards prohibiting the violation of effluent limitations and requiring the operation of adequate treatment facilities, which, as described above, Independence is violating. See 40 C.F.R. §§ 816.42 and 817.42, 38 C.S.R. §§ 2-14.5.b and 2-14.5.c. Consequently, Independence committed hundreds of violations of the terms and conditions of its surface mining permits. Cf. Powellton Coal, 662 F. Supp. 2d at 516. Accordingly, Plaintiffs are entitled to summary judgment on the issue of liability raised by their Fifth and Sixth Claims for Relief and a declaratory judgment that Independence has violated SMCRA and the State Act.

**PERMANENT INJUNCTIVE RELIEF**

To obtain a permanent injunction,

> [A] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). In general, courts should apply "traditional equitable principles" when deciding to grant injunctive relief for violations of the CWA. Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982). However, the Supreme Court specifically stated in Weinberger that a district court should "order that relief it considers necessary to secure prompt compliance with the Act." 456 U.S. at 320. In Amoco Prod. Co. v. Village of Gambell, the Court also stated that the district court should focus "on the underlying

14

substantive policy the [statutory] process was designed to effect . . . ." 480 U.S. 531, 544 (1987).

Following this guidance, the court in PIRG v. Top Notch Metal Finishing Co., 26 ERC 2012, 2015 (D.N.J. 1987), stated that an effluent limitation is:

> precisely that part of the [Act] which is foremost concerned with furthering the 'underlying substantive policy' of the environmental law: the preservation of the environment and the protection of mankind and wildlife from harmful chemicals.

Because discharge standards "are at the heart of the Clean Water Act," violations of those standards "directly and critically upset the Act's objective: i.e., 'to restore and maintain the integrity of the chemical, physical, and biological integrity of the Nation's waters,' 33 U.S.C. § 1251(a)." International Union v. Amerace Corp., Inc., 740 F. Supp. 1072, 1086 (D.N.J. 1990). "[T]he fact that defendant violated its permit by discharging more pollutants than authorized means that the restoration and enhancement of the river's water quality was inhibited and therefore, the objective of the Act was frustrated." PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158, 1167 (D.N.J. 1989), aff'd in part and rev'd in part on other grounds, 913 F.2d 64 (3d Cir. 1990). See also Hobet Mining 723 F. Supp. 2d at 924–25.

The Supreme Court has made clear that a court's discretion with regard to injunctive relief is not boundless. In United States v. Oakland Cannabis Buyers' Co-op., the Court stated:

> a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all.

532 U.S. 483, 497–98 (2002) (internal quotation marks, citations, and footnotes omitted).

The equities in this case favor an injunction. As shown above, Independence is

15

discharging selenium—a toxic pollutant—into Petry Fork of Matts Creek of West Fork of Pond Fork in unlawful quantities.  EPA recently issued a guidance document targeting selenium discharges from coal mining operations as a leading cause of stream impairment in Appalachia:

> A recent EPA study found that nine out of every 10 streams downstream of surface mining operations exhibit significant impacts to aquatic life. Another federal study found elevated levels of highly toxic and bioaccumulative selenium in streams downstream of valley fills. These impairments are linked to contamination of surface water supplies and resulting health concerns, as well as widespread impacts to stream life in downstream rivers and streams.

U.S. EPA, "Guidance Summary: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order," April 1, 2010, p. 2 (footnotes omitted).  In addition, the violation of an effluent limitation "presents strong evidence of irreparable harm."  Public Interest Research Gp. v. Yates Indus., Inc., 757 F. Supp. 438, 454 (D.N.J. 1991).  See also Hobet Mining, 723 F. Supp. 2d at 924.  Such environmental injury nearly always requires injunctive relief as a remedy.  Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 545 (1987).

Moreover, in a case like this, the balance of harms almost always tips in "favor [of] the issuance of an injunction to protect the environment."  Id.  That is so even where compliance with the CWA is costly.  Sen. Rep. No. 92-414, reprinted in 1972 U.S.C.C.A.N. 3668, 3711 (Congress recognized that "where industries have done nothing, their capacity to comply may be stretched to the limit"); Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co., LLC, 555 F. Supp. 2d 640, 649 (S.D. W. Va. 2008) ("There is no exception to permit compliance because such compliance is expensive."); PIRG v. Top Notch Metal Finishing Co., 26 ERC at 2016; PIRG v. CP Chemicals, 26 ERC 2017, 2022 (D.N.J. 1987); United States v. Ciampitti, 583 F. Supp. 483, 499 (D.N.J. 1984).  Finally, protection of the State's aquatic resources is in the public interest.  Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co., 555 F. Supp. 2d 640, 648 (S.D.

16

W. Va. 2008) (concluding that an injunction compelling a mining operator to treat its noncompliant discharges was in the public interest because "the public will be served by the protection of aquatic resources, as intended by the goals and purpose of the CWA and SCMRA"); Hobet Mining, 723 F. Supp. 2d at 925.

Under Oakland Cannabis, an injunction is the appropriate remedy for Independence's repeated violations of federal law. Congress has prioritized the protection of the waters of the United States over the needs of industry. Once a citizen-plaintiff has demonstrated that the defendant is in violation of the law, the party seeking injunctive relief only needs to show that there is some reasonable likelihood of future violations. Outboard Marine Corp., 692 F. Supp. at 822. Here, the repeated violations and the failure to operate effective treatment technology demonstrate a reasonable likelihood of future violations. The Court must assure that Independence complies with the CWA and SMCRA; non-enforcement is not an option. Oakland Cannabis, 532 U.S. at 497–98.

In short, the Court should declare that Independence is in violation of the CWA and SMCRA and should issue an injunction requiring Independence to come into compliance with the Clean Water Act and SMCRA as soon as possible.

## CIVIL PENALTIES

Once CWA liability has been established, the imposition of civil penalties is a requirement under the Act. Section 309(d) of the CWA provides that "[a]ny person who violates [specified sections] of this title, or any permit condition or limitation implementing any of such sections in a permit issued . . . by a State . . . shall be subject to a civil penalty." 33 U.S.C. § 1319(d). The Fourth Circuit Court of Appeals has held that this statutory language leaves "little doubt" that the assessment of a civil penalty is mandatory once liability is found under the Clean

Water Act.  Stoddard v. W. Carolina Reg. Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986).

As set forth above, Plaintiffs have established liability on their claim under the Clean Water Act.  Therefore, imposition of civil penalties is required.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Summary Judgment, issue appropriate declaratory and injunctive relief, impose appropriate civil penalties, and require the Parties to submit a proposed schedule for Phase II of this litigation, which will determine the scope of injunctive relief and the amount of civil penalties.

Respectfully submitted,

/s/ **Derek O. Teaney**
DEREK O. TEANEY (WVSB # 10223)
JOSEPH M. LOVETT (WVSB # 6926)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax: (304) 645-9008
E-mail: dteaney@appalmad.org

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH,
and SIERRA CLUB,

        Plaintiffs,

v.                              CIVIL ACTION NO. 5:12-cv-1464

MARFORK COAL COMPANY, INC., and
INDEPENDENCE COAL COMPANY, INC.,

        Defendants.

### CERTIFICATE OF SERVICE

      I, Derek O. Teaney, do hereby certify that, on January 8, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

M. Shane Harvey
Robert G. McLusky
Christopher Hunter
L. Jill McIntyre
Matthew S. Tyree
Jackson Kelly PLLC
1600 Laidley Tower
PO Box 553
Charleston, WV 25322

        Respectfully submitted,

        **/s/ Derek O. Teaney**
        Derek O. Teaney (W. Va. Bar No. 10223)
        Appalachian Mountain Advocates
        P.O. Box 507
        Lewisburg, WV 24901
        Telephone: (304) 793-9007
        Fax: (304) 645-9008
        Counsel for Plaintiffs