IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

OHIO VALLEY ENVIRONMENTAL COALITION, INC.,
WEST VIRGINIA HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH,
and SIERRA CLUB,

     Plaintiffs,

v.             CIVIL ACTION NO. 5:12-1464

MARFORK COAL COMPANY, INC., and
INDEPENDENCE COAL COMPANY, INC.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

Pending are cross-motions for partial summary judgment filed by Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., Coal River Mountain Watch, and Sierra Club ("Plaintiffs"), ECF No. 55, and Defendant Marfork Coal Co., Inc. ("Marfork"), ECF No. 50. For the reasons stated below, the Court **GRANTS in part** Marfork's motion as to the lack of standing of three of the plaintiffs, but otherwise **DENIES** the parties' motions.

## I.  BACKGROUND

Plaintiffs filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") and the Surface Mining Control and Reclamation Act ("SMCRA"). Plaintiffs allege that Marfork violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia. Before proceeding

to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

## A.        Regulatory Framework

The primary goal of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."   33 U.S.C. § 1251(a).   To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit.   33 U.S.C. §§ 1311(a), 1342.   Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA.   33 U.S.C. § 1342.   A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b).   West Virginia received such approval and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP").

Coal mines are also subject to regulation under the Surface Mining Control and Reclamation Act and the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA").   These statutes prohibit any person from engaging in or carrying out surface coal mining operations without first obtaining a permit.   30 U.S.C. § 1256.   Regulations passed pursuant to WVSCMRA require permittees to comply with the terms and conditions of a permit and all applicable performance standards.   W. Va. Code R. § 38-2-3.33c.   One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards."   *Id.* § 38-2-14.5b.   These limitations are guided by the NPDES permit.   Water quality standards establish conditions which must be maintained to preserve designated uses of the state's waters; such uses include public health and

the protection of animal, aquatic, and plant life.  Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection."  *Id.* § 38-2-14.5.c.

## B.    Factual Background

Marfork owns and operates the Brushy Fork Slurry Impoundment and the adjacent Beetree Surface Mine in Raleigh County, West Virginia.  The impoundment is subject to WV/NPDES Permit Number WV1015044[1] ("Impoundment Permit") and to Surface Mining Permit Number O301095.  Marfork obtained a separate WV/NPDES permit, number WV1021788, to operate the Beetree Surface Mine ("Beetree Permit").  The Impoundment Permit regulates the discharges from the impoundment, which has only one outlet, Outfall 001.  *See* Permit WV1015044, ECF No. 55-1.  The outfall discharges directly into the stream known as Brushy Fork.[2]  From the discharge point, Brushy Fork flows approximately 29 feet before it flows into Little Marsh Fork, which in turn flows into Marsh Fork.  *See* Williams Aff. ¶ 3, ECF No. 50-1.

Both the Impoundment Permit and the Beetree Permit require Marfork to limit and monitor the contents and characteristics of its discharges.  The Impoundment Permit sets effluent discharge limitations for specific pollutants: iron, manganese, and aluminum.  Permit WV1015044 at 2, ECF No. 55-1.  The Impoundment Permit does not identify selenium as one of the discharge constituents to be specifically limited and monitored.  *Id.*  The Beetree Permit,

---

[1]  The complaint mistakenly identifies Independence Coal Company as the holder of WV/NPDES Permit WV1015044 and WVSCMRA Permit O30195.  Compl. ¶¶ 42, 43.  Marfork acknowledges that it is the holder of these permits.  ECF No. 52 at 4.

[2]  WVDEP describes the stream and its flow as "Brushy Fork of Little Marsh Fork of Marsh Fork of the Big Coal River of the Coal River of the Kanawha River."  ECF No. 55-1 at 1.

which allows Marfork to discharge treated water and runoff into Brushy Fork and other streams, does require Marfork to measure and report the concentration of selenium in its discharge.   Permit WV1021788 at 2-17, ECF No. 55-2.   While the Beetree Permit lists selenium among the specific effluents in the permit, it does not set a specific discharge limitation; only monitoring and reporting is required.

Both permits incorporate the following provision:

> The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47CSR2.

W. Va. Code R. § 47-30-5.1.f.   West Virginia's WV/NPDES rules for coal mining facilities require this provision to be "incorporated into the WV/NPDES permits either expressly or by reference."   *Id.* § 47-30-5.   West Virginia's water quality standards promulgated for the protection of aquatic life impose limitations on selenium: an acute limitation of 20 parts per billion ("ppb") and a chronic limitation of 5 ppb.   *Id.* § 47-2, App'x E, tbl. 1.   The acute limitation is defined as a "one-hour average concentration not to be exceeded more than once every three years on the average."   *Id.*   The chronic limitation is a "four-day average concentration not to be exceeded more than once every three years on the average."   *Id.* n.2.

Plaintiffs assert three claims against Marfork, all based upon its alleged discharge of selenium into Brushy Fork.   First, Plaintiffs allege that Marfork is in violation of the CWA and the Impoundment Permit because its discharges from Outfall 001 caused violations of the chronic and acute water quality standards for selenium in Brushy Fork.   Second, Plaintiffs allege that Marfork is in violation of the SMCRA and its WV/SCMRA permit for the same reason.   Third, Plaintiffs claim that Marfork is in violation of the SMCRA and its WV/SCMRA permit by failing to install, operate, and maintain adequate treatment facilities as necessary to prevent discharges that violate state or federal law.

4

## II.     ANALYSIS

The parties dispute three primary issues, which the Court will address in turn after setting forth the standard for summary judgment.   First, the Court will determine whether Plaintiffs have constitutional standing to sue.   Second, the Court will discuss the statutory CWA "permit shields."   Third, the Court will identify the terms and conditions of Marfork's permit and will determine whether Plaintiffs have satisfied their burden of proof of CWA and SMCRA violations.

### A.     Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).   Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]"   *Anderson*, 477 U.S. at 256.   Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position.   *Anderson*, 477 U.S. at 252.

**B.      Constitutional Standing**

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution.   *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000) (citation omitted); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies").   In order to satisfy the minimum constitutional requirements for standing, a plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

When the plaintiff in question is an organization, it "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).   Among the injuries that may be addressed by a federal court are those to "an individual's aesthetic or recreational interests." *Gaston Copper I*, 204 F.3d at 154 (citing *Laidlaw*, 528 U.S. at 184).   This is of particular relevance to environmental cases.   *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972). In environmental cases, the "relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."   *Laidlaw*, 528 U.S. at 181.

6

Plaintiffs seek to establish standing through two individual declarants: Lisa Snodgrass and Robert Goodwin.   Plaintiffs argue that they have standing based on their use of Little Marsh Fork, downstream from Brushy Fork.   To determine whether these declarants have suffered an injury in fact, the Court must first decide whether Little Marsh Fork is affected by Marfork's discharge into Brushy Fork.   Second, the Court will analyze the nature of the declarants' alleged injuries. Third, the Court will decide whether the organizational Plaintiffs have satisfied the standing requirements.

### 1.      Little Marsh Fork is an "affected area"

Marfork argues that Plaintiffs cannot establish an injury in fact because the areas used by their members are too far removed from the area allegedly contaminated by the discharge from the impoundment.   Outfall 001 of the impoundment discharges directly into Brushy Fork, which empties into Little Marsh Fork.   Marfork argues that the only "affected area" of its discharge is Brushy Fork—the immediate receiving stream for Outfall 001.   Marfork argues that Brushy Fork is located entirely on private property and because Plaintiffs do not have access to Brushy Fork, they cannot be injured by the discharge of selenium into it.   The Court must therefore determine whether Little Marsh Fork is within the zone of impact of Defendant's activities before analyzing Plaintiffs' specific claims of standing.

As this Court explained in *Ohio Valley Environmental Coalition, Inc. v. Maple Coal Company*, 808 F. Supp. 2d 868 (S.D. W. Va. 2011), standing does not require a court to determine the merits of the environmental violations alleged.   808 F. Supp. 2d at 882 (citing *Laidlaw*, 528 U.S. at 181).   Rather, standing requires a demonstration that if the allegations of the CWA violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have "a direct nexus."   *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* (*Gaston*

*Copper II*), 629 F.3d 387, 395 (4th Cir. 2011).   Plaintiffs may rely on "circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability."   *Gaston Copper I*, 204 F.3d at 163.   To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations[,]" thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements."   *Id.* at 163-64.

The Court **FINDS** that the portion of Little Marsh Fork used by Plaintiffs is an area affected by discharge into Brushy Fork; consequently, Plaintiffs' use—or abstention from use—of Little Marsh Fork constitutes an injury in fact fairly traceable to the alleged violations.   First, the proximity of Little Marsh Fork to the point of discharge supports the conclusion that discharge violations into Brushy Fork affect Little Marsh Fork.   By Marfork's own estimate, Plaintiffs' use of Little Marsh Fork and Marsh Fork is at an area approximately 3.72 miles from the end of Brushy Fork.[3]   Williams Aff. ¶ 3, ECF No. 50-1.   This relatively short distance and the fact that Brushy Fork runs directly into Little Marsh Fork is circumstantial evidence that supports the conclusion that Little Marsh Fork is an "affected area."   *Cf. Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996) (finding plaintiffs' claims too attenuated where they used a body of water "located three tributaries and 18 miles" downstream from the defendant's refinery); *see also Friends of the Earth, Inc. v. Chevron Chem. Co.*, 900 F. Supp. 67,

---

[3] Because Plaintiffs do not challenge Marfork's estimate, the Court will use that measure.   The Court notes, however, that Defendant's estimate is the distance between County Route 3 and the end of Brushy Fork.   The declarants each testified to enjoying (or formerly enjoying) other parts of Little Marsh Fork and Marsh Fork, at points closer to the end of Brushy Fork.   Because their refraining from enjoying the areas they previously enjoyed is a sufficient injury in fact, these areas are also "affected areas."   For purposes of resolving this standing dispute, however, the Court will use the parties' estimate.

75 (E.D. Tex. 1995) (concluding that a distance of two to four miles between source of pollution and waterway used by plaintiffs was not too great to infer causation). Furthermore, Plaintiffs have produced evidence that selenium pollution is capable of traveling at least that great a distance. WVDEP, *Selenium-Induced Developmental Effects among Fishes in Select W. Va. Waters* 3-4 (Jan. 2010), ECF No. 64-2.

Second, Little Marsh Fork was within the state's contemplated impact area during Marfork's permitting process. Pursuant to federal regulations, WVDEP performed an "assessment of the probable cumulative hydrologic impacts (CHIA) of the proposed operation and all anticipated mining upon surface- and ground-water systems in the cumulative impact area." 30 C.F.R. § 780.21(g)(1). The CHIA prepared for Marfork's Brushy Fork Slurry Impoundment analyzed the Little Marsh Fork watershed, sampling surface water sites in both Little Marsh Fork and Brushy Fork. CHIA 1-2, ECF No. 62-6. WVDEP's decision to analyze Little Marsh Fork as part of Marfork's permitting process is circumstantial evidence of predictions of discharge influence, which supports the conclusion that Little Marsh Fork is within the affected area.

Finally, Plaintiffs have produced evidence that selenium has been detected in Little Marsh Fork and Marsh Fork, downstream of Brushy Fork. Analyses of water samples taken on consecutive days in October and December 2012 from Little Marsh Fork indicated the presence of selenium. Betcher Decl. ¶ 25, App'x F & G, ECF No. 55-9. This evidence provides additional support for the conclusion that Little Marsh Fork is within the affected area of Marfork's alleged violations. *See Crown Cent. Petroleum Corp.*, 95 F.3d at 362 (stating that plaintiffs may satisfy the "fairly traceable" element of standing in part by producing "water samples showing the presence of a pollutant of the type discharged by the defendant upstream").

9

### 2.    Declarants' use of the affected area

Having concluded that Little Marsh Fork is an affected area, the Court will now determine whether a "direct nexus exist[s] between the plaintiffs and the area of environmental impairment." *Gaston Copper II*, 629 F.3d at 395.   Specifically, the Court must evaluate whether the individual declarants have demonstrated an actual injury.  Ms. Snodgrass has a lifelong connection to the affected area, because she grew up along Little Marsh Fork.    Snodgrass Decl. ¶ 4, ECF No. 55-10. When she was young, she enjoyed playing, fishing, and searching for mudpuppies[4] and crawdads along Little Marsh Fork.  *Id.*   She and her family moved away from the area because "the dust and the noise [from mining activities] got so bad we were concerned about our well water." Snodgrass Dep. 9, ECF No. 55-12.   She and her family do not currently use the fork because of her concern about pollution.  *Id.* 13.   She regrets that due to pollution, she cannot take her granddaughter to the area to enjoy those same activities she enjoyed as a child.   *Id.*  Ms. Snodgrass has observed physical deformities in the stream's fish, and has seen many dead fish. Unlike when she was a girl, mudpuppies are now difficult to find.  If the stream were free of pollution, she would go into the stream again.   Snodgrass Decl. ¶ 6, ECF No. 55-10.  Ms. Snodgrass often drives along Marsh Fork; she used to enjoy seeing the river but now its current polluted condition "breaks [her] heart."  *Id.*  Ms. Snodgrass also has a family cemetery in the area.   Snodgrass Dep. 13-15, ECF No. 55-12.   Based on Ms. Snodgrass's testimony, the Court has no doubt that her aesthetic and recreational uses of the area have been harmed such that Marfork's alleged violations create an imminent and actual injury to Ms. Snodgrass.

Plaintiffs' second declarant, Robert Goodwin, is a resident of Kanawha County.   Goodwin Decl. ¶ 2, ECF No. 55-11.   He is an avid canoer and hiker.   He enjoys wading in streams and

---

[4] "Mudpuppies" are large aquatic salamanders.

looking for aquatic life.   *Id.* ¶ 5.   He testified that on several occasions, he has sat beneath a bridge near the confluence of the Little Marsh Fork and Marsh Fork, *id.* ¶ 10, and intends to do so in the future, *id.* ¶ 14.   He also canoes on Marsh Fork and intends to do so again.   Mr. Goodwin testified that his enjoyment of Little Marsh Fork is diminished when he thinks about the presence of selenium and its potential effect on fish.   *Id.* ¶ 13.   Mr. Goodwin has demonstrated a connection to the affected area.   As the Court concluded with regard to Ms. Snodgrass's activities, the Court finds that Mr. Goodwin's aesthetic and recreational uses have been harmed, such that he has established an imminent and actual injury.

The Court rejects Marfork's argument that Plaintiffs must show a violation of water quality standards to demonstrate an injury in fact sufficient to confer standing.   This argument is as unavailing now as it was when raised by defendants in other cases, including *Maple Coal*.   As the Fourth Circuit explained in *Gaston Copper I* and reiterated in *Gaston Copper II*, plaintiffs need not "demonstrate that the chemical content of the waterway was affected by the facility, or that there was other negative change in the ecosystem of the water."   *Gaston Copper II*, 629 F.3d at 395 (citation omitted).   Consequently, Plaintiffs' alleged harms to their recreational and aesthetic interests are sufficient to confer constitutional standing.

### 3.     Plaintiff Coal River Mountain Watch has satisfied the standing requirements

The Court concludes that the declarants, Ms. Snodgrass and Mr. Goodwin, have demonstrated a concrete and particularized injury in fact that is fairly traceable to Marfork's activities and is likely to be redressed by a favorable decision in this case.   Therefore, these declarants' injuries also confer standing on those organizations of which they are members.   *See Am. Canoe Ass'n, Inc.*, 326 F.3d at 517.   Here, Plaintiffs have submitted evidence that Ms. Snodgrass and Mr. Goodwin are members of Coal River Mountain Watch ("CRMW").

11

Snodgrass Decl. ¶¶ 2-3; Goodwin Decl. ¶¶ 2-3.   The interests CRMW seeks to protect in this lawsuit are certainly germane to one of its purposes: to improve the environment and quality of life in the southern coalfields of West Virginia.   Finally, neither the claim asserted nor the relief requested requires the participation of CRMW's individual members.   The Court **FINDS** that CRMW has constitutional standing to assert its claims against Marfork.

There is no evidence, however, that either Ms. Snodgrass or Mr. Goodwin is a member of any of the three remaining plaintiff organizations.   *See* Goodwin Dep. 29, ECF No. 55-13 ("I think [CRMW], I believe, is the only [environmental organization] that I would consider myself an official member of.").   Plaintiffs have produced no other declarants to support standing against Marfork.   Accordingly, the Court **FINDS** that Plaintiffs Ohio Valley Environmental Coalition, Inc. ("OVEC"), West Virginia Highlands Conservancy, Inc. ("WVHC"), and Sierra Club, have failed to demonstrate standing against Marfork.   The Court **GRANTS IN PART** Marfork's motion for partial summary judgment and enters judgment in favor of Marfork as to the claims of OVEC, WVHC, and Sierra Club, for lack of jurisdiction.   With respect to the claims of CRMW, Marfork's motion is **DENIED**.[5]

## C.    Permit Shield Defense

Marfork argues that the "permit shield" provisions of the CWA, and, more recently, West Virginia's Water Pollution Control Act, protect it from liability.   In this Part, the Court will discuss the terms and scope of the federal and state permit shields.

### 1.    Federal CWA permit shield

Section 402(k) of the CWA, known as the "permit shield," states:

---

[5] The organizational plaintiffs OVEC, WVHC, and Sierra Club may proceed with their claims against the co-defendant in this case, Independence Coal Company.   For the reasons stated in a separate memorandum opinion and order, Plaintiffs satisfied the standing requirements to assert their claims against Independence.

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of [government enforcement actions] and [citizen suits], with sections 1311 [effluent limitations], [and] 1312 [water quality related effluent limitations] . . . of this title . . . .

33 U.S.C. § 1342(k).

In *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977), the Supreme Court explained that the purpose of this section is "to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict."  430 U.S. at 138 n.28.  The Fourth Circuit has described how this language operates: "if a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability."  *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 266 (4th Cir. 2001).  *Piney Run* was a CWA citizen suit alleging that a county's sewage treatment plant was in violation of its NPDES permit, which was issued under Maryland's approved program.  At the time, Maryland had promulgated water quality standards for the waters within its borders, as the CWA required.  A Maryland state regulation provided that "[i]n order to grant a permit or a permit modification, the [Maryland Department of the Environment] must determine that the discharger will not violate these water quality standards."  *See id.* at 260.  Maryland's water quality standards included temperature standards.  *Id.*  The plant's NPDES permit contained express limitations on the amount of certain pollutants that may be discharged.  Heat was not listed among those limitations, nor did any other condition of the permit limit heat discharge.  Plaintiff argued that the plant was liable under the CWA for discharging a pollutant—heat—that was not allowed by its permit.  The plant claimed that the CWA's permit shield protected it from liability, because it was in compliance with the specific effluent limitations listed in its permit.

To determine the scope of the permit shield's protection, the court applied the familiar *Chevron* analysis. *Id.* at 266-67. After finding the statutory language ambiguous as to the scope of the permit protection, the Fourth Circuit deferred to the reasonable interpretation of the Environmental Protection Agency. In evaluating the reasonableness of the interpretation, the Court looked to the structure and purpose of the CWA. It observed that the CWA was a fundamental change in the regulation of water pollution in that it "shifted the focus away from water quality standards to direct limitations on the discharge of pollutants." *Id.* at 265 (quoting *Gaston Copper I*, 204 F.3d at 151). The court explained that the CWA establishes a default regime of strict liability. An entity discharging a pollutant violates the CWA unless the discharge fits within a limited exception, the primary exception being the NPDES permitting system. *Id.* After a permit applicant fully discloses the nature of its effluent discharges to the permitting authority, the authority analyzes the potential environmental risk and "places limits on those pollutants that . . . it 'reasonably anticipates' could damage the environmental integrity of the affected waterway." *Id.* at 268. Therefore, the court reasoned, certain discharges are implicitly authorized if they were disclosed and within the reasonable contemplation of the permitting authority, because otherwise a permittee would violate the terms of its NPDES permit if it discharged "an unlisted pollutant even at an infinitesimal amount." *Id.* at 271.

The court concluded that CWA's permit shield protects a permit holder that: (1) complies with all conditions of its permit; (2) complies with the express discharge restrictions set forth on the face of the permit; and (3) discharges pollutants that, although not specified in its permit, were disclosed to the permitting authority and within its reasonable contemplation. *Id.* at 269.

2.      **State Senate Bill 615**

In March 2012, the West Virginia Legislature enacted Senate Bill 615 to create a permit

shield of its own.   The preamble of S.B. 615 declares:

> AN ACT to amend and reenact §22-11-6 of the Code of West Virginia, 1931, as
> amended, relating to making West Virginia's Water Pollution Control Act
> consistent with the federal Water Pollution Control Act, also known as the Clean
> Water Act, by clarifying that compliance with the *effluent limits* contained in a
> National Pollution Discharge Elimination System permit is deemed compliant with
> West Virginia's Water Pollution Control Act.

Senate Bill No. 615, Ex. 10, ECF No. 51-3 (emphasis added).   The statute provides in relevant

part:

> Notwithstanding any rule or permit condition to the contrary, and except for any
> standard imposed under section 307 of the federal Water Pollution Control Act for
> a toxic pollutant injurious to human health, compliance with a permit issued
> pursuant to this article shall be deemed compliance for purposes of both this article
> and sections 301, 302, 306, 307 and 403 of the federal Water Pollution Control Act.
> . . . The provisions of this section addressing compliance with a permit are intended
> to apply to all existing and future discharges and permits without the need for
> permit modifications. However, should any such modification be necessary under
> the terms of this article, then the secretary shall immediately commence the process
> to effect such modifications.

W. Va. Code § 22-11-6(2).   The operative language here—"compliance with a permit . . . shall be

deemed compliance for purposes of [the state law and the CWA]"—essentially tracks the language

of the federal permit shield.   *Compare* W. Va. Code § 22-11-6(2), *with* 33 U.S.C. § 1342(k).

It appears that no state court has had an opportunity to address this new provision, which

became effective March 10, 2012.   When required to determine the meaning of a state statute in

the absence of a state judicial opinion, federal courts must determine how the state's highest court

15

would rule.[6]   If the state's highest court "has spoken neither directly nor indirectly on the particular issue before [the federal court, then the federal court is] called upon to predict how that court would rule if presented with the issue."   *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005) (citation omitted).

The Supreme Court of Appeals of West Virginia has adopted the two-part test set forth by the United States Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).   *Sniffin v. Cline*, 456 S.E.2d 451, 455 (W. Va. 1995).   That standard requires the Court to first ask "whether the Legislature has 'directly spoken to the precise [legal] question at issue.'"   *Id.* (quoting *Chevron*, 467 U.S. at 842).   If the Legislature's intent is clear, "that is the end of the matter," *id.* (quoting *Chevron*, 467 U.S. at 842), and the Court must give effect to the expressed intent of the Legislature.   If the statute is ambiguous, the second step of *Chevron* requires the Court to "defer to the agency's interpretation of its governing statute and regulations, as long as (1) the agency has promulgated that interpretation pursuant to a notice-and-comment rulemaking or a formal adjudication, and (2) the agency's interpretation is reasonable."   *Piney Run*, 268 F.3d at 267 (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) & *Chevron*, 467 U.S. at 843).   The Court will therefore follow the approach used by the Fourth Circuit in *Piney Run* and apply these standards to determine the scope of the state permit shield.

The language of W. Va. Code § 22-11-6(2) is nearly identical to the language of the federal statute, which the Fourth Circuit found ambiguous in *Piney Run*.   Like the federal permit shield,

_____

[6] Although this case is before the Court based on federal question jurisdiction, state law nonetheless applies to this particular issue and the Court must determine what the state law is.   *See* 19 Arthur R. Miller, Fed. Prac. & Proc. § 4520 (2d ed.) ("It frequently is said that the doctrine of Erie Railroad Company v. Tompkins applies only in diversity of citizenship cases; this statement simply is wrong. The Erie case and the Supreme Court decisions following it apply in federal question cases as well.").

the state statute specifies that "compliance with a permit issued pursuant to this article shall be deemed compliance for purposes of both this article and sections 301, 302, 306, 307 and 403 of the [CWA]." W. Va. Code § 21-11-6(2). Indeed, the state statute includes additional language that adds to the ambiguity. Section 21-11-6(2) prefaces the operative language as follows: "Notwithstanding any rule or permit condition to the contrary . . . ." Marfork argues that there is no ambiguity here; the Legislature's intent is clearly stated in the bill's preamble, which declares:

> AN ACT to amend and reenact §22-11-6 of the Code of West Virginia, 1931, as amended, relating to making West Virginia's Water Pollution Control Act consistent with the federal Water Pollution Control Act, also known as the Clean Water Act, by *clarifying* that compliance with the *effluent limits* contained in a National Pollution Discharge Elimination System permit is deemed compliant with West Virginia's Water Pollution Control Act.

W. Va. Code § 22-11-6 (emphasis added). While a bill's preamble may provide some insight into the intention of the Legislature, *see* Syl. Pt. 7, *Slack v. Jacob*, 8 W. Va. 612, 613 (1875) ("The preamble may be consulted in some cases to ascertain the intentions of the Legislature."), the preamble of S.B. 615 does nothing to clarify the inconsistency within the text of the statute itself. First, the text of the statute does not read "compliance with effluent limits;" rather, it says "compliance with a permit." Second, the text of the statute's internal inconsistency remains: in order to receive the permit shield's protection, a permittee must comply with a permit, "notwithstanding any . . . permit condition to the contrary." The Court concludes that the permit shield language here is ambiguous as to the scope of the shield's protection: must a permittee comply with all the permit conditions or not?

The Court must then apply *Chevron*'s second step. WVDEP has promulgated, pursuant to a formal notice-and-comment rulemaking, an interpretive rule regarding the state permit shield. That rule was adopted by the agency and approved by the Legislature, and became effective July 1, 2013. XXX W. Va. Reg. 774 (May 10, 2013). This rule contains an amendment to §

17

47-30-5.1.f.   The rule retains the operative language requiring compliance with water quality standards, but now includes the following:

> However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11.

*Id.*  This rule only adds ambiguity and by its terms, has no new effect.   It is merely a reference to a pre-existing rule, § 47-30-3.4.a, which already provided a permit shield protection identical to the federal shield.   The amended rule does not address whether WVDEP interprets the statute as requiring compliance with effluent limits *only*, or whether a permit holder is expected to comply with the rule and permit condition concerning water quality standards, even for pollutants that are not embodied in a specific effluent limitation.   Thus, unlike the EPA adjudication cited in *Piney Run*, this agency interpretation provides the Court no guidance as to the proper construction of S.B. 615, because the interpretation itself is ambiguous.

Although not entitled to *Chevron* deference, WVDEP has issued statements in official correspondence that further explain the agency's views regarding the state permit shield.   In these statements, however, the agency has asserted two contradictory positions regarding the scope of the permit shield.   In response to an EPA inquiry about the effect of S.B. 615, WVDEP informed EPA that "West Virginia does not consider this 'new' law a change to West Virginia's [NPDES] program."   Letter from Kristin A. Boggs, Gen. Counsel, WVDEP, to Jon M. Capacasa, Director, Water Prot. Div., U.S. Envtl. Prot. Agency Region III (Aug. 9, 2012), ECF No. 69-1.   The agency continued that the bill "is meant to clarify that West Virginia NPDES permits are intended to shield regulated entities from citizen suits to the same extent as NPDES permits issued by EPA."   *Id.*  That is, the state permit shield is "intended to be co-extensive" with the federal shield.   *Id.*

18

WVDEP reiterated this interpretation in correspondence to Marfork's counsel: "Senate Bill 615 was simply intended to clarify and confirm DEP's long-standing understanding, *i.e.*, that West Virginia's permit shield is entirely co-extensive with federal law." Letter from Boggs to M. Shane Harvey, Esq. (June 14, 2013), ECF No. 89-4. This position ignores the fundamental question: does § 47-30-5.1.f, as a permit condition, require permit holders not to cause a violation of water quality standards, even for pollutants that are not embodied in specific effluent limitations?

The federal permit shield, as explained by the Fourth Circuit in *Piney Run*, requires compliance with all conditions of a permit. West Virginia has chosen to include as a condition of all WV/NPDES permits for mining operations the requirement that they must not cause a violation of water quality standards. If S.B. 615 is truly co-extensive with the federal permit shield, then permit holders are not protected from suit if they are violating this condition. In *Piney Run*, by contrast, Maryland did not have a rule similar to West Virginia's here. The permit at issue in that case did not have a separate condition requiring a permit holder not to cause a violation of water quality standards for temperature. Therefore, the defendant was not in violation of its permit where it discharged heat that actually did cause violation of those water quality standards, because that pollutant was disclosed to the permitting authority and within its reasonable contemplation. According to WVDEP's first interpretation, therefore, the state permit shield is entirely co-extensive with the federal shield, in which case Marfork would not be shielded from violating its permit by causing a violation of water quality standards.

WVDEP has also stated a contrary interpretation. In March 2012, Plaintiffs' counsel here filed a complaint with WVDEP against another coal company on the same grounds as the suit against Marfork: counsel alleged that the company, Fola Coal Company ("Fola"), had violated its

permit by causing a violation of the water quality standard for selenium, and asked that WVDEP take enforcement action.   In response, WVDEP wrote that the state permit shield "has the effect of preventing the State from taking enforcement action against a permit holder for violation of water quality standards that are not embodied in effluent limitations that are expressed in a NPDES permit."   Letter from Thomas L. Clarke, WVDEP, to Derek O. Teaney, Esq. (June 5, 2012), ECF No. 69-5.   However, even though WVDEP disclaimed authority to take enforcement action, it did assure counsel that "the State will be taking administrative action pursuant to the [West Virginia CWA] to compel Fola to address selenium at the locations in question."   *Id.*   In its "Order for Compliance," WVDEP informed Fola that laboratory samples indicated a violation of the water quality standard for selenium in Fola's discharge streams.   *Id.*   This action demonstrates that WVDEP believed it lacked the authority to pursue enforcement action for past violations, but still viewed Fola's discharge as wrongful and as a problem needing to be addressed.[7]   Under this interpretation, S.B. 615 effectively repeals § 47-30-5.1.f, eliminating the requirement that coal operations not cause violation of water quality standards for pollutants not listed in the table of specific effluent limitations.

---

[7] WVDEP, however, has not been entirely consistent in its enforcement actions.   In December 2012, six months after the agency claimed it lacked the authority to enforce Fola's alleged violations, it entered into a consent decree with another coal mining operation to settle nearly identical allegations.   In that case, WVDEP filed a complaint against Consol of Kentucky in the Circuit Court of Mingo County, alleging violations of a number of WV/NPDES and WV/SCMRA permits.   In the consent decree, the parties acknowledged that WVDEP could amend its complaint to include alleged violations of another WV/NPDES permit, based on violations of the water quality standard for selenium.   This WV/NPDES permit, like Marfork's here, lacked a specific effluent limitation for selenium but included the water quality standard provision.   Therefore, the agency's professed ability to pursue enforcement in Consol's case was apparently based on violation of the condition prohibiting a permittee from causing violation of water quality standards.   *See* Consent Decree, *Mandirola v. Consol of Kentucky, Inc.*, No. 11-C-492 (Cir. Ct. of Mingo Cnty., Dec. 27, 2012), at ¶¶ 3, 12, & Ex. A, ECF No. 90-2.

In summary, WVDEP advances two conflicting interpretations of the state permit shield. Under the first, it is entirely co-extensive with the federal permit shield, affording protection to permit holders that comply with all the permit conditions.   Under the second, the permit shield is read as eliminating a specific condition of all WV/NPDES permits for coal operations.   The Court does not find this second interpretation reasonable.[8]   This interpretation would require the Court to accept the proposition that the West Virginia Legislature intended to repeal § 47-30-5.1.f by statute, even though the text of the statute makes no reference to that rule or its requirements, and the rule revisions do not delete or alter the water quality standard rule or permit condition.   This interpretation would eliminate an important condition that is included—by a rule promulgated by a state agency and approved by the Legislature—to ensure a minimum level of compliance with water quality standards.

The Court believes that the intent of the Legislature was, as it declared, to clarify that a permit holder is protected from enforcement action if it complies with the effluent limits of its permit.   "Effluent limits" need not refer only to the table of specific limitations in Section A.2 of the permit; an "effluent limit" is any restriction placed on a permit holder's discharge.   *See* 33 U.S.C. § 1365(f)(6) ("'[E]ffluent standard or limitation . . .' means a permit or condition thereof . . . .").   Thus, the state permit shield protects permittees from enforcement to the same extent as the protections offered by the federal permit shield.   Because the scope of the shield is co-extensive, permittees must comply with all conditions of a permit, including explicit and implicit discharge

---

[8] Plaintiffs argue alternatively that the permit shield would not protect Marfork in this case because it would constitute a revision to West Virginia's NPDES program.   The Court additionally observes that had the West Virginia Legislature eliminated the rule requiring compliance with water quality standards, which would also constitute a revision to West Virginia's approved NPDES program.   Such revisions generally are not effective unless and until approved by EPA.   40 C.F.R. § 123.62(b)(4).   Based on the Court's ruling, however, it is unnecessary to decide this question.

authorizations, and all reporting and monitoring requirements.   The Court must therefore determine whether Marfork is in compliance with the discharge authorizations of its permit.   To accomplish this, the Court must identify the conditions and requirements of the permit.

**D.     Terms and Conditions of Permit WV1015044**

To determine whether Marfork is in compliance, the Court must analyze the scope of its WV/NPDES permit.   That is, does Marfork's permit allow the discharge of selenium, either explicitly, or implicitly[9]?

**1.      The permit is not ambiguous**

The starting point, of course, is the text of the permit itself.   Section A of Permit WV1015044 expressly limits the discharge of certain pollutants, like iron, manganese, and aluminum.   ECF No. 55-1.   It does not expressly limit selenium.   Assuming selenium was adequately disclosed as a discharge and within the reasonable contemplation of WVDEP, Marfork would not be in violation of the CWA, if this were the only relevant section of the permit.   Section C of the permit, however, incorporates by reference W. Va. Code R. § 47-30-5.1.   That rule provides, "[t]he discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2."

The Court interprets the terms of an NPDES permit using the principles of contract interpretation.   *Piney Run*, 268 F.3d at 269 (citing *Nw. Envtl. Advocates v. Portland*, 56 F.3d 979, 982 (9th Cir. 1995)).   Accordingly, the Court must first determine whether the language is ambiguous.   *Id.* at 269-70.   "If the language is plain and capable of legal construction, the language alone must determine the permit's meaning."   *Id.* at 270 (quoting *FDIC v. Prince*

---

[9]  "Explicit" authorization is granted by the precise effluent limitations identified in the permit. "Implicit" authorization refers to those other discharges that come within the protection of the permit shield—those that were: (1) adequately disclosed to the permitting authority; and (2) within the reasonable contemplation of the permitting authority.   *Piney Run*, 268 F.3d at 271.

*George Corp.*, 58 F.3d 1041, 1046 (4th Cir. 1995) (quotation marks omitted)).   If the language is ambiguous, however, then the Court must "look to extrinsic evidence to determine the correct understanding of the permit."   *Id.* (citing *Nw. Envtl. Advocates*, 56 F.3d at 983-84).   The Court concludes that the operative language here—"[t]he discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47CSR2"— is not ambiguous.

Marfork urges the Court to find ambiguity in the phrase "applicable water quality standards," arguing that this language refers to only those discharges WVDEP deems applicable to a permit holder as evidenced by the specified effluent limitations.   The Court disagrees.   The phrase "applicable water standards" in Section 47-30-5.1.f refers to the standards applicable to a particular water body and its designated use.   West Virginia has designated certain uses for the waters in the state and promulgated standards specific to each designated use.   W. Va. Code § 47-2.a App'x E tbl. 1.   Water quality standards are thus applicable to a particular use, not to a particular discharger.   *See Monongahela Power Co. v. Chief, Office of Water Res., Div. of Envtl. Prot.*, 567 S.E.2d 629, 633 (W. Va. 2002) ("*A water segment* found not to be within its applicable water quality standard *for its designated use* is considered to be threatened or impaired.") (emphasis added); *see also PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 715 (1994) (interpreting 33 U.S.C. § 1313(c)(2)(A) to plainly state that water quality standards contain two components: designated use of water and water quality criteria based upon such use; "a project that does not comply with a designated use of the water does not comply with the applicable water quality standards"); *Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 16 F.3d 1395, 1405 (4th Cir. 1993) ("Thus, where multiple uses are designated for a body of water,

there may be multiple criteria applicable to it."). Therefore, Defendant's argument is unpersuasive.

Because the provision at issue is not ambiguous, it must be given its plain meaning. The plain language of the provision is clear: "[t]he discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47CSR2." Thus, if a permit holder does cause a violation of the water quality standards applicable to the body of water into which it discharges pollutants, then the permit holder has violated the terms of its permit. The permit shield would not protect such a permittee from liability, because the shield only applies to a permit holder who complies with *all* the conditions of its permit.

### 2. The permit requires compliance with water quality standards

Even if this provision were ambiguous, the Court disagrees with the interpretation advanced by Marfork. Examining the extrinsic evidence of this provision's meaning, in light of the requirements and purpose of the CWA, persuades the Court that the water quality provision was intended to require permit holders to not cause a violation of water quality standards—a requirement that is separate and distinct from specific effluent limitations set forth in the schedule in Section A.2 of the permit. The CWA requires that "every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet 'water quality standards.'" *Piney Run*, 268 F.3d at 265 (quoting *Am. Paper Inst. v. U.S. Envtl. Prot. Agency*, 996 F.2d 346, 349 (D.C. Cir. 1993) (citing 33 U.S.C. § 1311(b)(1)(C))). Importantly, the CWA requires authorities to include "any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to

any State law or regulations."   33 U.S.C. § 1311(b)(1)(C); *see also* 33. U.S.C. § 1313(e)(3)(A).

To be approved to operate its own NPDES program, a state program must include the authority to

issue permits which "apply, and insure compliance with, any applicable requirements of sections

1311 [effluent limitations], 1312 [water quality related effluent limitations], 1316 [national

standards of performance], and 1343 [ocean discharge criteria]."   33 U.S.C. § 1342(b)(1)(A).

West Virginia's Water Pollution Control Act is codified at W. Va. Code § 22-11-1 *et seq.*

This Act created the regulatory framework through which the State administers its approved

NPDES program.   In 1984, West Virginia consolidated the State's surface mining program and

water pollution control program for coal mines and related entities; that is, it combined the State's

NPDES and SMCRA programs.   Letter from Willis Hartig, Jr., Dir., Dep't of Natural Res., to A.

James Manchin, Sec. of State (Oct. 18, 1984), ECF No. 93-4.   As part of this restructuring, the

NPDES rules were reorganized into separate series for coal and non-coal facilities.   The rules

applicable to coal operations include several conditions that the rules for non-coal operations do

not, including the condition that discharges shall not cause violation of water quality standards.

W. Va. Code R. § 47-30-5.1.f.   *Cf.* W. Va. Code R. § 47-10-5 (series applicable to all other

NPDES permits lacks this condition regarding water quality standards).

Marfork argues that this discrepancy is an unintentional oversight and that the Legislature

and WVDEP (and its predecessor agencies) never intended to treat the coal industry any

differently from other industries.   The Court reviewed the available legislative history of these

NPDES rules.   While the Court could not identify the exact origin of the rules applicable to coal

facilities,[10] which contain the water quality provision at issue here, there is an explanation for the discrepancy in the West Virginia Surface Mining Reclamation Rule.   That rule includes a performance standard requiring that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards."   W. Va. Code R. § 38-2-14.5b.   This performance standard explains why the water quality standard provision is specifically included in NPDES permits for coal facilities and not those for other industries.

WVDEP and/or its predecessor agency, the Department of Energy, promulgated rule § 47-30-5.1.f requiring compliance with water quality standards for coal mining operations.   The state agency took the affirmative action to promulgate this rule, and the West Virginia Legislature also acted affirmatively to adopt it.   WVDEP has also complied with the rule's directive that it be made a permit condition.   This rule cannot now be interpreted such that it has no meaning. Marfork essentially argues that the specific effluent limitations trump the incorporated water quality standard provision.   According to Marfork, if WVDEP reviewed an application which truthfully disclosed the presence of selenium in its discharge and chose not to establish specific limitations for selenium, then the permit holder is protected by the permit shield.   The problem with this interpretation is that it effectively nullifies the water quality standard provision.

Instead, the Court believes that this provision is intended as a backstop—a minimum level of compliance required of permit holders.   This reading relies on its unambiguous text and places the provision in harmony with the CWA.   As discussed *supra*, the CWA requires state programs to include such limitations as necessary to comply with the state's water quality standards.   Rule §

---

[10] A handwritten editor's note states that this series, W. Va. Code R. § 47-30, "was previously Section 10 of [the Department of Natural Resources'] Surface Mine Reclamation Regulations which were transfered [sic] to the [Department] of Energy as DOE Series 2.   This NPDES section remained with DNR.   This is why the section numbers are 10."   W. Va. Code R. § 47-30 (1986). The Court could not locate this reference, and is therefore unable to determine whether the water quality standards provision existed prior to the consolidation.

47-30-5.1.f is precisely that: a permit limitation to ensure that a permit holder does not cause a violation of water quality standards.   Under West Virginia's approved NPDES program, therefore, WVDEP evaluates a permit application and imposes specific effluent limitations for those pollutants that it estimates threaten water quality standards.   In no event, however, may a permit holder discharge pollutants that cause a violation of water quality standards.   This has the effect of protecting water quality standards even regarding pollutants for which WVDEP did not establish specific permit effluent limitations.   As a backstop, this provision protects water quality standards that WVDEP did not anticipate would be threatened based on the discharge levels reported in a permit application.   Accordingly, the Court **FINDS** that the water quality standard is an enforceable condition of Marfork's permit.   A violation of this condition would cause Marfork to fall outside the permit shield's protection.

The Court's conclusion is in accord with "the statutory language, legislative history, and case law" explained by the Ninth Circuit in *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995).   *Northwest Environmental Advocates* was a citizen suit alleging violations of a condition of an Oregon NPDES permit, which provided that "no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards."   56 F.3d at 985.   The Ninth Circuit rejected the defendant's argument that Congress intended to foreclose citizen suit enforcement of water quality standards that were not translated into specific effluent limitations.   *Id.* at 986.   The court concluded that the legislative history reflects "Congress'[s] intention to grant *broad* authority for citizen enforcement," *id.* at 987, and "[t]he fact that Congress created a new, simpler enforcement method based on effluent limitations does not mean that Congress intended to foreclose citizen suit enforcement of water quality standards," *id.* at 986.   This Court agrees and finds that like Oregon, West Virginia intended to

require permittees not to cause violation of water quality standards, and furthermore, citizen suits may be used to enforce this condition.

### 3.    The permit shield defense is unavailable to Marfork

With the requirements of Marfork's permit established, the Court concludes that the permit shield defense is not available to Marfork.   As discussed *supra*, the permit shield protects those who comply with all conditions of a permit.   Marfork's permit includes the condition that its discharges not cause a violation of the water quality standard for selenium.   The permit shield therefore explicitly authorizes the discharge of selenium only to the extent that it does not cause a violation of water quality standards.

The Court rejects Marfork's arguments that its discharges are protected by the permit shield.   Marfork relies on the results reached in *Piney Run* and *Atlantic States Legal Foundation v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993), where circuit courts found that discharges were protected by the federal permit shield.   In each of those citizen suits, the plaintiffs claimed violations of statutory and regulatory provisions purporting to make illegal the discharge of any pollutant not expressly allowed under the permit.   *Piney Run*, 268 F.3d at 264 ("The [district] court . . . concluded that the [defendant] was liable under the CWA because the discharge of heat was not expressly allowed by the permit."); *Atlantic States*, 12 F.3d at 357 ("[Plaintiff] argues first that the plain language of Section 301 of the CWA . . . prohibits the discharge of any pollutants not expressly permitted.").   Both courts concluded that the pollutants at issue, though not limited by any permit condition, were disclosed and contemplated within the permitting process, thus implicitly within the permit.   Here, there is a regulation and a permit condition which expressly limit the amount of pollutants within the discharge.

*Piney Run* and *Atlantic States* both rest on a simple construction of the CWA's NPDES permitting process—that every discharge will likely include many pollutants, but only those which jeopardize water quality standards must be specifically regulated by the permit. *See Piney Run*, 268 F.3d at 265-66 ("Before issuing a permit the permitting authority must . . . incorporate discharge limitations necessary to satisfy the state water quality standard.") (citations and quotations omitted); *Atlantic States*, 12 F.3d at 358 (describing the "step-by-step process" of developing water quality-based limitations, explaining that such limits "are established where the permitting authority reasonably anticipates the discharge of pollutants by the permittee at levels that have the reasonable potential to cause or contribute to an excursion above any state water quality criterion"). Each court refused to read the NPDES statutory and regulatory provisions as literally requiring every pollutant in any amount within a discharge to be specifically approved, which would be contrary to the intended scope of a permit. Neither case, however, involved a permit condition and regulation expressly imposing limits on pollutants which cause violations of water quality standards, a policy consistent with the NPDES scheme.

Moreover, the Court would reach the same conclusion even if Marfork's permit did not include a condition imposing water quality standard limitations. Marfork would have the Court apply the final step in the *Piney Run* analysis to the pollutant at issue here, but appears to contend that mere disclosure of the pollutant during the application process is enough to earn implicit discharge authorization. It is not; the Fourth Circuit set forth two requirements: (1) was selenium adequately disclosed to the agency during the permitting process; *and* (2) were the discharges of excessive selenium within the reasonable contemplation of the approved permit? See *Piney Run*, 268 F.3d at 271. Under WVDEP's 2007 Selenium Implementation Guidance, SMCRA and NPDES permits for activities determined "to have the potential to cause or contribute to selenium

violations" must provide additional information to the agency, and, if "determined to have reasonable potential to violate selenium [water quality conditions]," the applicant's permit should contain operating requirements for the control of selenium with monitoring and selenium effluent limitations.   Selenium Implementation Guidance, WVDEP Permit Handbook Section 32 (Nov. 13, 2007), ECF No. 51-2.   Marfork's permit application indicated a water sample from Outfall 001 with a low amount of selenium.   Application for WV/NPDES Permit, Mod 2 at 9 tbl. 2-IV-C, ECF No. 51-1 (indicating a maximum daily concentration of selenium of 2.09µg/L).   This amount was apparently insufficient to indicate a potential to cause or contribute to a selenium water quality condition violation, leading to the permit here with no monitoring or effluent limit for selenium.

Now that sampling has revealed persistently high levels of selenium above the water quality standard during the life of this permit, the Court finds that the amount of selenium actually discharged at Outfall 001 was not within the reasonable contemplation of the agency at the time of the permit, and consequently not within the permit shield.   See *Piney Run*, 268 F.3d at 268.

## E.    Requirements for a Citizen Suit under the CWA and the SMCRA

Having determined the scope of the permit shields and the requirements of Marfork's permit, the Court now turns to the final issue: whether Plaintiffs have demonstrated that they are entitled to relief.

### 1.    Plaintiffs provided sixty days' notice

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA or Secretary of the Department of Interior, and the state in which the alleged violation occurred.   33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A); *see also Gaston Copper II*, 629 F.3d at 391.   The notice

30

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a); *see also* 30 C.F.R. § 700.13(e).   Providing such notice "is a mandatory condition precedent to filing suit under [the CWA]."   *Gaston Copper II*, 629 F.3d at 399 (citing *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)).   "Without adequate notice, the Court does not have subject matter jurisdiction to hear the case."   *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 437 (D. Md. 2010) (citation omitted).   The purpose of the notice is to "allow a potential defendant to identify its own violations and bring itself into compliance voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) (citations omitted), and to "allow[ ] Government agencies the opportunity to take responsibility to enforce the environmental regulations," *Assateague Coastkeeper*, 727 F. Supp. 2d at 437 (citing *Hallstrom*, 493 U.S. at 29).   Accordingly,

> as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement.   The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002).   "The sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the time notice was provided.   *Gaston Copper II*, 629 F.3d at 401.

Plaintiffs have plainly satisfied their statutory obligation to provide sixty days' notice. Plaintiffs sent notice to the required parties on March 9, 2012.   Ex. 10, ECF No. 53-10.   Marfork admits that the notice requirements of the CWA and the SMCRA are satisfied by the March 9, 2012 letter.   Def.'s Resp. to Pls.' Request for Admissions ¶ 1, ECF No. 55-14.

### 2.      Plaintiffs have sufficiently alleged an ongoing violation

A citizen suit under the CWA may be commenced "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter or . . . an order issued by the Administrator or a State with respect to such a standard or limitation."  33 U.S.C. § 1365(a)(1).  Likewise, under the SMCRA, a person may commence a citizen suit "against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to [the SMCRA]."  30 U.S.C. § 1270(a)(1).  This is a jurisdictional requirement.  The United States Supreme Court expounded on the "alleged to be in violation" requirement, finding that this requirement is satisfied and a federal district court has jurisdiction "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 64 (1987).[11]  The Supreme Court specifically rejected the proposition that "citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505."  *Id.* at 64.  Good-faith allegations, not definitive proof, suffice for jurisdictional purposes.[12]   *Id.* at 65.

Plaintiffs claim that three sets of data satisfy this requirement: (1) pre-complaint discharge monitoring reports ("DMRs"); (2) October 2012 measurements taken during the course of discovery; and (3) December 2012 measurements taken during discovery.  First, Plaintiffs claim

---

[11]  The standard for demonstrating proof of a violation is a higher burden than the standard required to demonstrate citizen suit standing under the CWA.   To ultimately succeed in a citizen suit, the citizen plaintiff must prove an ongoing violation, which may be accomplished "either: (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171–72 (4th Cir.1988) ("*Gwaltney II* ").

[12]  The Supreme Court espoused the view that "Congress's use of the phrase 'alleged to be in violation' [in section 505] reflects a conscious sensitivity to the practical difficulties of detecting and proving chronic episodic violations of environmental standards."  *Gwaltney,* 484 U.S. at 65.

that Marfork's DMRs, submitted in compliance with the Beetree Permit, prove pre-complaint violations.   The samples for this data came from a monitoring point in Brushy Fork.   According to Plaintiffs, these DMRs show that the waters of Brushy Fork exceeded the water quality standards for selenium at least 30 times between December 2008 and May 2012.[13]   ECF No. 55-4. Plaintiffs state that Marfork's impoundment caused these violations because there is no other source of selenium discharging into Brushy Fork.

Second, Plaintiffs tested samples over four consecutive days in October 2012, during a Rule 34 inspection.[14]   Plaintiffs took four samples (one on each consecutive day) directly from the spillway of Outfall 001, and four samples from Little Marsh Fork.   Due to confusion and misinformation about the location of the streams, no samples were taken from Brushy Fork.   The samples taken directly from the Outfall 001 discharge have a four-day average that exceeds the chronic selenium standard.   The average of the samples from Little Marsh Fork, however, does not violate the standard.

Finally, both Plaintiffs and Defendant took samples on six consecutive days in December 2012.   The samples were taken from three locations: at the Outfall 001 spillway, Brushy Fork, and Little Marsh Fork.   Plaintiffs' data indicate a four-day average that violates the selenium water quality standard both at Outfall 001 and Brushy Fork.   Little Marsh Fork did not exceed the water quality standard.   Marfork's data also demonstrates a violation of the selenium standard from the Outfall 001 spillway.   Its data for Brushy Fork, however, is in disagreement with Plaintiffs' data

---

[13]  According to Plaintiffs, there were 29 instances of violations of the chronic selenium standard and a single violation of the acute selenium standard.

[14]  Federal Rule of Civil Procedure 34 permits a party to request entry onto "designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, . . . test, or sample the property or any designated object or operation on it." Fed. R. Civ. P. 34(a)(2).

and indicates no violation.   According to Plaintiffs, this result is best explained by a sampling error.   Plaintiffs claim that Marfork's contractor erroneously switched two of the samples from the December 12, 2012 sampling event, recording the Little Marsh Fork result as the Brushy Fork result, and vice versa.   If this error were corrected, Marfork's data would also show a violation of the selenium standard in Brushy Fork.

The Court is satisfied that Plaintiffs have made good-faith allegations of continuous or intermittent violations sufficient to confer jurisdiction in this case.   For the reasons discussed *supra*, the permit shield defense is unavailable to Marfork, based on Plaintiffs' allegations that it has violated a condition of its permit.   In support of their motion for summary judgment, Plaintiffs have cited both pre- and post-complaint measurements that provide a basis for the allegation that Marfork is causing a violation of the selenium water quality standard.   The Court therefore finds that Plaintiffs have satisfied CWA's jurisdictional requirement.

### 3.        Plaintiffs have not yet proven a CWA violation

While Plaintiffs' evidence is sufficient to satisfy the jurisdictional requirement, it is not sufficient proof of a continuing violation to prevail on summary judgment.   A number of material factual issues remain in dispute.   First, the parties disagree as to whether the DMR data is sufficient to prove a pre-complaint violation of the selenium water quality standard.   Defendant argues that the data is insufficient because the standard is defined as a "four-day average concentration," and Plaintiffs lack pre-complaint data from four consecutive days.   Plaintiffs claim that measurements from four consecutive days are not required and that a violation can be

proven using other calculations.[15]   In the absence of additional evidence, from an expert or otherwise, Plaintiffs have not conclusively demonstrated that the available data proves a pre-complaint violation of the selenium water quality standard.   Second, the parties dispute whether the October 2012 and December 2012 datasets prove a post-complaint violation. Marfork's data from December 2012 disagrees with Plaintiffs' data.   Additionally, Marfork argues that Plaintiffs' reliance on the measurements of the spillway discharge of Outfall 001 is invalid because it is not an accurate measure of the selenium content in the stream itself.

Because of these disputes of material fact, the Court **DENIES** both parties' motions for summary judgment.   The Court will issue a separate order regarding further proceedings in this case.

### III.   CONCLUSION

For the reasons discussed above, the Court **FINDS** that the Court has jurisdiction over this case.   Plaintiff Coal River Mountain Watch has sufficiently demonstrated that it has standing and has made good-faith allegations of continuing violations of the Clean Water Act.   Furthermore, the Court **FINDS** that Marfork's WV/NPDES permit includes the condition that it not cause a violation of water quality standards.   The permit shields provided by federal and state law do not provide Marfork protection from enforcement action if this permit condition is violated.

The Court **GRANTS in part** Marfork's motion against OVEC, WVHC, and Sierra Club due to those organizations' lack of standing.   Because the Court concludes that there remains a genuine dispute of material fact as to whether Marfork violated its permit condition, the Court

---

[15] Plaintiffs alternatively argue that even if measurements from four consecutive days were required, it could satisfy that by an October 2010 maximum measured selenium concentration of 75.52 µg/L in Brushy Fork.   *See* ECF No. 55-3 at 3.   The Court rejects this argument and agrees with Marfork that this value is plainly due to a recording error.   *See* Cook Aff., ECF No. 69-6. This value, therefore, is not credible evidence.

otherwise **DENIES** the parties' motions.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        August 22, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE